**Nicholas Duran BALLARD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–04–00039–CR.**

Court of Appeals of Texas,
Texarkana.

Submitted Jan. 20, 2005.

Decided April 8, 2005.

Elizabeth L. DeRieux, Brown McCarroll LLP, Longview, for appellant.

Ray Bowman, Asst. Dist. Atty., Longview, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

In an unusual sequence of events, Nicholas Duran Ballard kidnapped his former girlfriend, Leigh Anne Lambeth, at gunpoint, forced her to accompany him to his house, had admittedly consensual sex with her, and then asked her to accompany him in a car on a local bill-paying trip—even leaving her alone in the passenger seat of the car two times during the trip while he went into businesses to pay bills. This appeal, after a somewhat labyrinthine path through the courts,[1] involves solely Ballard's complaint that, tried for aggravated kidnapping, he failed to get a reduced punishment under Section 20.04(d) of the Texas Penal Code because the trial court failed to find that Ballard voluntarily released Lambeth in a safe place.[2] Ballard challenges the sufficiency of the evidence to support the trial court's finding. We find the evidence sufficient and therefore affirm. To explain how we reach that conclusion, this opinion addresses (1) the standards and scope of our review; (2) whether, under Section 20.04(d), one "releases" his or her kidnapping victim by just making it easy for him or her to escape, or, in other words, reduces the restraints on the victim; and (3) the sufficiency of the evidence.

### 1. The Standards and Scope of Our Review

■ It is generally accepted that the burden of proof at trial dictates the standard of appellate review. *Zuniga v. State,*

---

1. On August 10, 2001, Ballard pled guilty to aggravated kidnapping, a first-degree felony. The trial court deferred adjudication and placed him on community supervision for ten years. The next month, the State filed an application to revoke Ballard's community supervision. The State amended its application October 10, 2001, alleging Ballard committed another offense, had failed to report to community supervision, and had violated other administrative terms of his community supervision. On October 22, 2001, the trial court found that Ballard had committed a new offense and had failed to report to the community supervision officer. The trial court then adjudged Ballard guilty and sentenced him to fifty years' confinement.

Ballard appealed, and this Court dismissed his appeal for want of jurisdiction. *See Ballard v. State,* No. 06–01–00220–CR (Tex.App.-Texarkana Aug. 22, 2002, no pet.) (not desig-nated for publication). Ballard then filed a petition for writ of habeas corpus in which he complained of trial counsel's failure to assert that Ballard voluntarily released Lambeth in a safe place. Ballard's trial counsel stated he did not know that such a showing could mitigate the punishment for a kidnapping conviction. The Texas Court of Criminal Appeals granted the writ and remanded the matter for a new punishment trial on the issue of voluntary release.

On remand, the trial court determined that Ballard failed to show by a preponderance of the evidence that he voluntarily released Lambeth in a safe place. The trial court imposed the original sentence of fifty years. It is from this second punishment hearing that Ballard now appeals.

2. Tex. Pen.Code Ann. § 20.04(d) (Vernon 2003).

144 S.W.3d 477, 484 (Tex.Crim.App.2004); *Howard v. State*, 145 S.W.3d 327, 333 (Tex. App.-Fort Worth 2004, no pet.). Ballard bore the burden of proving this defensive issue by a preponderance of the evidence. *See* TEX. PEN.CODE ANN. § 20.04(d). There is also agreement among the courts of appeals that the proper standard of *factual* sufficiency review—where the defendant has the burden of proof by a preponderance of the evidence—is whether, after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex.Crim.App.1990).

■ But the courts of appeals split on whether a court of appeals even possesses jurisdiction to review *legal* sufficiency of the evidence where the defendant bears the burden of proof by a preponderance of the evidence. The disagreement on this issue seems to center on the *Meraz* court's establishment of a standard for reviewing factual sufficiency of the evidence on an issue where a defendant has the burden of proof by a preponderance of the evidence.

In *Meraz*, the appellant challenged a jury's determination that he was competent to stand trial on charges of sexual assault of a child. *See id.* at 147. The Texas Court of Criminal Appeals held that Article V, Section 6 of the Texas Constitution conferred conclusive jurisdiction on the intermediate appellate courts to resolve challenges to the fact-finder's failure to find in favor of a defendant's affirmative defense. *Id.* The court went on to establish the widely-accepted standard for reviewing the factual sufficiency of the evidence on this type of finding. *Id.*

But the extensive discussion regarding jurisdiction over such points of error and the appropriate standards for reviewing them left open issues regarding legal sufficiency review. The courts of appeals have split on how to interpret *Meraz* on that issue. To illustrate the disagreement, we will examine recent cases outlining our sister courts' interpretations of *Meraz* when an appellant challenges the legal sufficiency of the evidence to support the fact-finder's rejection of an issue on which the appellant bears the burden of proof.

According to the minority view, represented by *Patterson v. State*, *Meraz* stands for the position that the courts of appeals do not have jurisdiction to review the legal sufficiency of the evidence on these types of issues. *See Patterson v. State*, 121 S.W.3d 22, 24 (Tex.App.-Houston [1st Dist.] 2003, pet. dism'd).[3] Under this interpretation, when a defendant seeks appellate review of a fact-finder's failure to make a finding on which the defendant has the burden of proof, such as on an affirmative defense, the defendant invokes the appellate court's factual sufficiency review jurisdiction. *Id.; Naasz*, 974 S.W.2d at 421. Because, the *Patterson* and *Naasz* courts held, the courts of appeals have no legal sufficiency review jurisdiction in this situation, each overruled the appellant's legal sufficiency point of error and went on to address the factual sufficiency issue. *See Patterson*, 121 S.W.3d at 24; *Naasz*, 974 S.W.2d at 421.

On the other hand, the majority of the intermediate appellate courts does not read *Meraz* to exclude a legal sufficiency review of the evidence. *See Howard*, 145 S.W.3d at 332.[4] Because *Meraz* draws

3. *Patterson* cited *Naasz v. State*, 974 S.W.2d 418, 421 (Tex.App.-Dallas 1998, pet. ref'd), and concluded that the court of appeals lacked legal sufficiency review jurisdiction on

an affirmative defense on which a defendant bore the burden of proof.

4. *Nolan v. State*, 102 S.W.3d 231, 237–38 (Tex.App.-Houston [14th Dist.] 2003, pet.

from civil law in linking factual sufficiency review of a rejected affirmative defense to the preponderance of the evidence burden of proof at trial, the *Howard* court concluded the appropriate legal sufficiency standard of review is likewise found in civil law, in cases in which the burden of proof at trial is proof by a preponderance of the evidence. *Id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

Under the civil standard of review, an appellant challenging the legal sufficiency of the evidence to support an adverse answer on which he or she had the burden of proof must satisfy two inquiries. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the finding, then the entire record must be examined to see if the appellant's position on the issue is established as a matter of law. *Id.; Sterner,* 767 S.W.2d at 690.

We agree with the *Howard* court that the *Sterner* standard is the proper legal standard of review for a criminal defendant's legal sufficiency challenge to the fact-finder's rejection of a Section 20.04(d) sentence reduction. We conclude we are to review both the factual and legal sufficiency of the evidence.

### 2. "Release" Under Section 20.04(d) Requires More than Simple Reduction of Restraints

Aggravated kidnapping is generally punished as a first-degree felony, carrying a sentence of five to ninety-nine years or life. TEX. PEN.CODE ANN. §§ 12.32(a), 20.04(c) (Vernon 2003). At the punishment stage of a trial, an individual convicted of aggravated kidnapping is eligible for a lesser sentence if he or she can show by a preponderance of the evidence the individual "voluntarily released the victim in a safe place." TEX. PEN.CODE ANN. § 20.04(d). If the defendant successfully shows this mitigating factor, the offense for which he or she was convicted becomes punishable as a second-degree felony rather than a first-degree felony. So, on a showing of voluntary release in a safe place, the defendant is subject to a reduced range of punishment, two to twenty years. TEX. PEN.CODE ANN. § 12.33. (Vernon 2003); *Brown v. State,* 98 S.W.3d 180, 181–82 (Tex.Crim.App.2003).

Here, Ballard argues he voluntarily released Lambeth in a safe place within the meaning of the statute because he left her alone in the car, twice, giving her the power to escape. That requires a close examination of the caselaw addressing "release."

In *Brown,* the defendant brought the victim to the hospital only after she prom-

ref'd) (addressing legal sufficiency issue); *Torres v. State,* 976 S.W.2d 345, 347 (Tex. App.-Corpus Christi 1998, no pet.) (addressing legal sufficiency); *Moranza v. State,* 913 S.W.2d 718, 723 (Tex.App.-Waco 1995, pet. ref'd) (addressing legal sufficiency for sake of argument); *Cover v. State,* 913 S.W.2d 611, 619 (Tex.App.-Tyler 1995, pet. ref'd) (addressing legal sufficiency); *Cooney v. State,* 803 S.W.2d 422, 425 (Tex.App.-El Paso 1991, pet. ref'd) (addressing legal sufficiency); *see also Roybal v. State,* No. 04–02–00647–CR, 2003 WL 22241629, at *2 (Tex.App.-San Antonio Oct. 1, 2003, no pet.) (not designated for publication) (addressing legal sufficiency); *Gonzalez v. State,* No. 2–02–291–CR, 2003 WL 21101520, at *2 (Tex.App.-Fort Worth May 15, 2003, pet. ref'd) (not designated for publication) (addressing legal sufficiency); *Centell v. State,* Nos. 07–98–0344–CR & 07–98–0345–CR, 2000 WL 96246, at *4 (Tex.App.-Amarillo Jan. 28, 2000, pet. ref'd) (not designated for publication) (addressing legal sufficiency for sake of argument); *Brena v. State,* No. 07–97–0429–CR, 1999 WL 606681, at *2 (Tex.App.-Amarillo Aug. 11, 1999, pet. ref'd) (not designated for publication) (addressing legal sufficiency).

ised she would claim her neck wound he caused was self-inflicted. *Brown*, 98 S.W.3d at 182. The trial court concluded Brown had not voluntarily released his victim because he had been tricked or manipulated into taking her to the hospital. *Id.* The Tyler Court of Appeals agreed, holding that, in order for the action to qualify as a voluntary release, the action must be the spontaneous product of the actor's free will, uninfluenced by another's persuasion, coercion, or solicitation. *Id.*

The Texas Court of Criminal Appeals disagreed with the Tyler court, rejecting such a broad definition and, instead, applying a narrow definition of "voluntary" under Section 20.04(d) of the Texas Penal Code. *Id.* at 188. In order for the action to be voluntary, there can be no element of rescue by police or escape by the victim. *Id.* The court concluded such a definition was consistent with the legislative purpose of Section 20.04(d) to encourage kidnappers to release their victims. *Id.*

On remand, the Tyler court concluded that, based on the narrow definition of "voluntary release," Brown should have been subject to the lesser sentence under Section 20.04(d) although he may have been tricked or manipulated into bringing his victim to the hospital for medical treatment. The Tyler court reversed and remanded the case for a new punishment hearing. *Brown v. State*, 109 S.W.3d 550, 551 (Tex.App.-Tyler 2003, no pet.); *see also Patterson*, 121 S.W.3d at 25 (kidnapper voluntarily released children in safe place even though release may have been conditional when he returned children to their mother based on her promise she would not call police).

In a second case, after a road-rage episode in which a kidnapper, Carreon, chased recklessly after a driver who cut him off in traffic, Carreon wrecked the vehicle carrying him and the two elderly women he kidnapped. *Carreon v. State*, 63 S.W.3d 37, 38 (Tex.App.-Texarkana 2001, pet. ref'd). After he began screaming at his captives to push the car out of the ditch, citizens confronted him. *Id.* After one of the victims alerted the gathering crowd that Carreon was holding them at gunpoint, the citizens scuffled with Carreon until police arrived and took Carreon into custody. *Id.*

The trial court properly refused to include a jury instruction on whether Carreon voluntarily released his victims in a safe place. *Id.* Concluding that the evidence did not raise the issue that Carreon had done so, this Court overruled Carreon's point of error and affirmed the trial court's sentence. *Id.*

■ Although decided before *Brown*, *Carreon*'s rationale remains largely sound in light of *Brown*.[5] We noted in *Carreon* that the application of Section 20.04(d) should focus on whether the defendant performed an act of release, not whether the victim had the means to escape. *Id.* at 39. We repeat this Court's conclusion in *Carreon* that an accused, in order to trigger the mitigating effect of Section 20.04(d), "must have performed some overt and affirmative act that brings home to the victim that he/she has been fully released from captivity." *Id.; see Harrell v. State*, 65 S.W.3d 768, 772 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd); *Hernandez v. State*, 10 S.W.3d 812, 822 (Tex.App.-Beaumont 2000, pet. ref'd). That analysis is

---

5. *Carreon*'s reliance on the language from *Oestrick v. State*, 939 S.W.2d 232 (Tex.App.-Austin 1997, pet. ref'd), is now questionable, however. Language that the action must be free from compulsion was called into question by *Brown*'s rejection of such a broad definition under Section 20.04(d).

consistent with the holding in *Brown* that "voluntary release" does not include rescue or escape.

In a third case, *Storr*, the victim left his car running outside and entered a post office. *Storr v. State*, 126 S.W.3d 647, 648, 652–53 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd). Inside the post office, a masked man held a gun to the victim's head, demanded his wallet, and then ordered him to return to the car. *Id.* Another masked man had entered the car and was sitting in the driver's seat. *Id.* After driving to a dark, isolated area, the masked men threatened to kill the victim and forced him into the trunk of the car when another car approached the area. *Id.* The men then began driving with the victim in the trunk. *Id.* After being stopped for a traffic violation and gaining the victim's cooperation and silence by threat, the men allowed the victim out of the trunk and forced him to drive back to the post office. *Id.* They then got out of the car and left. *Id.* The victim then drove home. *Id.*

Relying on the definition of voluntary release in *Brown*, the Fourteenth court concluded that, on these facts, defense counsel rendered ineffective assistance when he failed to request an instruction under Section 20.04(d) for a reduced sentence. *Id.* at 653. The court held that the evidence conclusively established the defendant had voluntarily released the victim in a safe place. *Id.* at 652.

Thus, we review the evidence to determine whether it is legally and factually sufficient to support the trial court's finding that Ballard did not voluntarily release Lambeth by taking some affirmative step of release beyond merely reducing his restraints on Lambeth.

### 3. The Evidence Is Sufficient To Support the Finding on Release

■ First, we review the evidence generally, before assessing its sufficiency and finding it legally and factually sufficient.

Ballard and Lambeth share a child from their prior relationship; and, although Ballard may have married another woman sometime before the kidnapping, he had gained access to Lambeth's email records and was angered to discover she had started a relationship with another man. On an earlier occasion, Ballard had told Lambeth he would kill her if she had another boyfriend. According to Lambeth, Ballard had also assaulted her and had broken into her home.

When Lambeth arrived at the Kilgore College campus for her classes April 5, 2001, Ballard confronted her and kidnapped her at gunpoint. Lambeth explained her fear when Ballard approached her with the handgun: "I was scared and I was going where [Ballard] said. I did not want him to kill me."

Ballard compelled Lambeth to drive to his house in Henderson, where the two had consensual sex.[6] Lambeth's initial statement indicates that, even though Ballard no longer held a gun on her after the two arrived at his house, he still had control over her movement and she was not free to leave. Lambeth stated she was "scared to try to leave because [she] knew he would catch [her]." While the two were at Ballard's house, Lambeth admits, she wanted to leave, but Ballard would not let her.

After approximately three hours at the house, Ballard then had Lambeth go with

---

6. Lambeth explained their having intercourse that day as part of a pattern of behavior during their relationship: "I feel like I have to try to get along with him or he will make my life hell. I feel there is no way out."

him in a car to pay bills. Hoping he would let her go home after the errands, she accompanied him.

Ballard did not take his gun on the trip. Ballard left Lambeth in her running vehicle while he went into two different locations. Lambeth stated she considered leaving him there: "I started crossing over into the driver's seat wanting to leave him and [Ballard] returns to the car before I could leave." She also expressed her desire to go home and her hope that, after the errands, she could go home. At a different point, she stated she felt she was free to go and no longer felt as though she was in danger. At the bank, she thought Ballard was no longer a threat and that she could have escaped. Rather than being afraid of Ballard, she felt depressed and upset.

She no longer feared that Ballard would catch her if she left and explained it was her decision to stay: "I could leave if I wanted to, but I didn't want to leave him there." She attributes her remaining in the truck to her own feelings. She did not leave at that point, she said, "[b]ecause [she] wouldn't do that to him, [she] wouldn't leave him stranded." At that point, "everything was back to normal." To demonstrate when Lambeth felt she was out of danger and free to go, she testified to the following:

> I could have left him, you know. I didn't have to take him to town, I could have left in the car then, I just didn't. I just felt—I didn't feel he was a threat to me at that point and I knew he wouldn't harm me after that. I pretty much knew he wasn't going to harm me after we talked a little while in the car on the way to his house.

However, in her initial statement, she also stated, "I didn't leave because I just got back in the groove that I was used to." It is unclear whether, by this statement, Lambeth meant either that she remained with Ballard willingly or that she had acquiesced to Ballard's control and the unhealthy dynamics of their prior relationship. So, with respect to the time frame covering the bill-paying errands, Lambeth's initial statement contains significant evidence that, while Ballard no longer held the weapon on her, the elements of fear and control did play a part in Lambeth's remaining in the truck when Ballard went into the store.

After Ballard paid bills, the two returned to Ballard's house, because he asked her to do so. Ballard then attempted to persuade her to call the police to tell them that she was well and that there was no cause for concern. Lambeth refused.

The police arrived at the residence.[7] As the police approached, Ballard physically restrained Lambeth and tried to get her to tell the police that all was well. "[Ballard] was holding onto me and I was trying to leave. He was grabbing my arm hard and was not going to let me leave. A few minutes after this, I told him I had to go, and this is when the Henderson police showed up at the house."

Initially, Lambeth complied with Ballard's directives, and the officers let the two drive away from his house. Shortly after the two left, Ballard had to return to get an item he had forgotten at the house. When separated from Ballard, Lambeth admitted to the police—still at the house—what had happened, and they directed her to drive to the police station. She described her emotional state when she finally admitted to the police what had hap-

---

7. Apparently, people at Kilgore College, where Ballard had abducted Lambeth, had reported the abduction.

pened: "I was just ready for everything to be over with at that point, I just wanted to go home and just go home."

Ignoring all evidence to the contrary, we now review the evidence for legal sufficiency by looking to the record for evidence that supports the trial court's adverse finding on this issue where Ballard had the burden of proof by a preponderance of the evidence. See Howard, 145 S.W.3d at 333–34.

Lambeth explained, with respect to the beginning of the ordeal, that she was going to go wherever Ballard directed her out of fear of being killed. This fear seemed to continue on arrival at Ballard's house, since Lambeth wanted to leave but was too frightened to do so. She expressed her fear that Ballard would find her. She indicated that she went with Ballard to run errands with the hope she could leave afterward, indicating that she did not feel free to leave before the errands. On their return to Ballard's house, Lambeth's captive status became more obvious again when Ballard held onto her when police arrived. Evidence suggests she did not feel free to go at this point since she was too afraid to even relay the actual happenings to the police while she was in Ballard's presence. It was only after she was apart from Ballard that she enlisted the aid of the police.

Based on Brown's definition of voluntary release, the evidence supports the trial court's failure to find that Ballard voluntarily released Lambeth by temporarily leaving her in her vehicle while he ran errands. In order for Lambeth to be free from Ballard at that time, there is evidence she would have had to flee, leaving Ballard in the store. Such a requirement appears to fall into the category of "escape" which, under the narrow definition advanced by Brown, will not qualify the defendant's conduct as a voluntary release

under Section 20.04. Keeping in mind the guidance from Carreon, we are to analyze Ballard's actions rather than those of the victim or what the victim could have or should have done in the situation.

Like the facts before us, the kidnappers in Storr left the victim in a motor vehicle with its motor running. In contrast, however, in Storr the kidnappers left their victim without any expressed intent of returning to the vehicle and without evidence of knowing how to find him later or of any continuing power over him, thus leaving that victim free to return to his home. Here, when Ballard left Lambeth in her vehicle, the evidence suggests that he intended to return momentarily, he knew how to find her later had she driven off, and he had some continuing power over her. In Storr, there was no such evidence.

We conclude there is legally sufficient evidence to support the trial court's failure to find that Ballard voluntarily released Lambeth in a safe place.

For our factual sufficiency review, we consider all the evidence relevant to this issue and will determine whether the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. See Meraz, 785 S.W.2d at 154–55. Having already outlined the evidence supporting the trial court's finding, we will now add to the discussion the evidence that may be seen to support a contrary finding.

The evidence that would tend to support a finding that Ballard did voluntarily release Lambeth is found in Lambeth's testimony depicting the events surrounding the trip to pay bills. She testified Ballard left her alone in her car while he went inside. Lambeth testified that, at the time, she thought she was free to go and no longer felt as though she was in danger.

Lambeth's testimony contains elements of two different scenarios, one in which

Ballard continued to control her and one in which she wanted to stay with him out of an apparent sense of loyalty. Lambeth's own testimony may provide an explanation for these contrasting portraits. Lambeth reveals her bias and an interest in having changed or colored her testimony to be more favorable to Ballard. She states that Ballard's harsh sentence caused her more pain than the ordeal itself. She also expressed her wish that her son be able to spend time with his father.

Certainly, the evidence does reveal a reduction in Ballard's control over Lambeth, but never do Ballard's actions constitute a voluntary release of Lambeth. While there is conflicting evidence on the matter—and Lambeth's testimony is not entirely clear on whether she felt free to leave—what is clear is that the trial court, acting as finder of fact in the face of conflicting evidence, was authorized to believe or disbelieve any portion of the evidence.

*Conclusion*

Legally and factually sufficient evidence supported the trial court's conclusion that Ballard's actions did not constitute "voluntary release" to trigger mitigation of Ballard's punishment for aggravated kidnapping. Here, Ballard did not communicate to Lambeth that she was free to go, and later events when the police were involved demonstrated that she probably was, in fact, *not* free to go. Ballard's act of temporarily leaving Lambeth in the vehicle may have permitted her to escape easily, but, under *Brown,* allowing a kidnapping victim the ability to escape does not constitute a release.

Accordingly, we overrule Ballard's contention and affirm the trial court's judgment.