NUMBER 13-08-00624-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


FRANCISCO SALAZAR GONZALEZ, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 138th District Court

of Cameron County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Yañez and Garza


Memorandum Opinion by Justice Garza



 Appellant, Francisco Salazar Gonzalez, was convicted of murder, a first-degree
felony. See Tex. Penal Code Ann. § 19.02 (Vernon 2003). The jury found Gonzalez to be
a habitual felony offender and sentenced him to life imprisonment. See id. § 12.42(d)
(Vernon Supp. 2009). By six issues on appeal, which we characterize as four, Gonzalez
argues that: (1) the trial court's jury instructions "expand[ed] the basis upon which the jury
may [have] f[ou]nd [him] guilty of murder"; (2) the evidence was legally and factually
insufficient to support the jury's finding against him on the issue of sudden passion; (3) the
trial court erred by failing to submit a jury instruction as to criminally negligent homicide;
and (4) he was deprived of a fair trial due to the "cumulative error" of the trial court. We
affirm.

I. Background

 Gonzalez was indicted for the murder of his wife of nearly ten years, Toni Lyn Sasek
Gonzalez ("Sasek"). This was the second marriage for both Gonzalez and Sasek, and
Sasek had three minor children from her prior marriage. Testimony at trial established that
Gonzalez and Sasek enjoyed a good relationship during the early years of their marriage,
but that the relationship changed at some point, in part because Gonzalez became
increasingly suspicious that Sasek was having sexual relationships with other men. So
concerned was Gonzalez that his wife was unfaithful that he placed several audio
recording devices around the family's house in Harlingen, Texas, in an attempt to prove
her infidelity.

 At some point, Gonzalez discovered "moans" on one of the audio recordings. 
Gonzalez testified at trial that he "could not identify what those moans meant or who they
belonged to"; nevertheless, he confronted his wife about her alleged infidelity on May 6,
2007. Gonzalez testified as follows:

I went inside the house and I talked to Toni. And we started talking, and I
asked her who had been there just casually, and she said no one. And then
I asked her again, who had been there. . . . I kept on asking her, and she,
third time she said, no one. And she was getting a little bit flustered that I
was asking her. . . . I told her not to lie to me, that I had proof that someone
had been there. . . . I told her to tell me the truth. She wouldn't. She said
no one had been there. . . . I asked her to tell the truth one more time, and
she said she is telling me the truth, and then . . . I slapped her, she slaps me
back. She pulls on my shirt, I try to get her away from me. We end up on
the bed and she kicks me . . . . Then we calm down a little bit, then we start
talking. . . . And I asked her, I keep on repeating that question, who was
here? And she keeps on avoiding me. . . . [W]e start talking some more,
and she says that she has been doing this for a while, but she is not
mentioning any names, and I want to know who. . . . And I am throwing out
names and she is not answering to any of them. . . . And finally I get her to
say yes, but you'll have to leave the house, you can't stay here any more
after that. . . . 


Gonzalez testified that the couple then left the house, went into his truck which was parked
outside, and continued to argue. When asked by defense counsel "at what point do you
get the gun?", Gonzalez replied that "[t]he gun was always in my back pocket--yes, in my
back pocket at that time, and then I moved it from my back pocket to my side waistband." 
Gonzalez continued his testimony:

A. [Gonzalez] Well, we start driving out, and we are still
arguing. Finally I stopped in the driveway and I
asked her some more questions, basic questions
like who are they? Who is it? Are there
several? Are you doing the same things that we
were fantasizing about? And she answers some
questions, but she doesn't answer the ones I
want to know the most.


 She answers yes, I have been doing some of the
stuff that we have been fantasizing about, but
she won't tell me who, with who. . . . I said, look,
just tell me who it is, we'll go see the tape, and
then I'll leave.


Q. [Defense counsel] And then what happens?


A. She tells me who it is.


Q. Now, what happens next, if anything?


A. We start arguing and fighting some more. . . . 
Like why, why do you do this to me? And she
couldn't tell me a specific reason why, and I said
don't you love me any more? And she told me
she does love me, and we would argue about
that. How can you love me and do this? And
she couldn't answer.


Q. Then what happens next?


A. Then we start mentioning--I start mentioning,
what are those things that you do that we were
fantasizing about?


Q. And what does she respond?


A. To the trios and gangbangs.


Q. And what happens next?


A. I get pretty angry.


Q. And then?


A. Then I slap her. I said tell me, I want her to
know that I am serious about I wanted to know
who it is, and she starts hitting me back.


Q. And then what happens?


A. Then she tries to exit, and I pushed the button
on my door for the lock. I said, no, you are going
to stay and you are going to tell me who it is,
who you have been doing this with. A lot of
yelling. And then she opened the door and tried
to exit, and I shot her.


Q. Now, when this happened, what was going
through your mind?


A. I was pretty angry, pretty enraged, pretty
betrayed. I felt like ten years, it's nine years that
I have been with her, all the work, everything, for
nothing.


 . . . . 


Q. What did you intend, if anything?


A. I wanted to find out what was going on, that's
what I really wanted to find out more than
anything else. I wanted to find out who she was
fooling around with and why. That's it.


 Gonzalez stated that he then called 911 and went "into hiding" on his property. He
eventually turned himself in and gave a sworn, written statement to police in which he
stated that, during the altercation, he "shot [Sasek] in the stomach" and that he "shot her
a second time in the left back shoulder blade."

 At the charge conference, the trial court denied Gonzalez's request for an instruction
on the lesser-included offense of criminally negligent homicide. See id. § 19.05 (Vernon
2003). The jury then found Gonzalez guilty of murder.

 At the sentencing phase of trial, all evidence from the guilt-innocence phase of trial
was re-admitted. Defense counsel then asked the jury to find that Gonzalez caused
Sasek's death while "under the immediate influence of sudden passion arising from an
adequate cause." See Tex. Penal Code Ann. § 19.02(d) ("At the punishment stage of a
trial, [a murder] defendant may raise the issue as to whether he caused the death under
the immediate influence of sudden passion arising from an adequate cause. If the
defendant proves the issue in the affirmative by a preponderance of the evidence, the
offense is a felony of the second degree.").

 The jury heard from various witnesses during the punishment phase. Sheila King,
Sasek's sister, testified that Sasek's children had once told her that Gonzalez "would tell
them that if his mother ever left him, that he was going to kill her, and when he got out of
jail, he was going to kill them." Kirsten Davenport, Sasek's eldest child, testified that:

Living with [Gonzalez] for about ten years was really, really hard, was a
nightmare actually. He verbally abused me and my sister and my
brother. . . .  There was a lot of physical abuse from the time that he married
my mom, and there were a couple of instances where he would beat
me . . . he used a cutting board actually, and I had bruises all over my lower
body [when] I was either between fifth or sixth grade, I was pretty young.


According to Kirsten, Gonzalez "would threaten me and my sister, that if we would ever
turn him in for child abuse, that he would come after us. . . . He said he would kill us." 
Kirsten stated she never called the police about any of the things Gonzalez did because
she was afraid that she "would be punished for that."

 Marsha Davenport, Sasek's younger daughter, testified without objection that
Gonzalez "is an evil man." She stated that "he would punch us, hit us, he would pull our
hair, just the typical stuff. . . . He called us names. He really put down my brother a lot,
like he would yell at us a lot. It was over-anger, it wasn't, like necessary. . . . He's just
short tempered, I guess." Douglas Davenport, Sasek's youngest child, testified that
Gonzalez "is pathetic because he used to beat us up for useless reasons, and he treated
us like crap."

 Gonzalez's ex-wife, Esther Siscoe, testified about an incident where Gonzalez
refused to let her visit her sister. According to Siscoe, Gonzalez "hit me, beat me, left me
black and blue, my whole face was swollen." Siscoe further stated that Gonzalez "put a
gun to my head, he handcuffed me to the bed, he left me there while he ran an errand, and
I think it was like six or seven hours when he came back." The next day, Gonzalez took
Siscoe to her sister's house, at which point Siscoe "told him to leave the house or else I
was going to call the cops. He tried to talk to me to make me go back with him, and I said
no. I didn't go back, and thank God I am here today. . . . I never saw him again."

 Javier Martinez, M.D., a licensed psychologist, testified for the defense. Dr.
Martinez stated that he was asked to offer a professional opinion as to whether Gonzalez
acted with "sudden passion" in causing Sasek's death. He interviewed and examined
Gonzalez, and stated that Gonzalez appeared to be "troubled, very troubled by the
problems within [his] relationship" with Sasek. When asked if he was able to make any
diagnosis of a mental disorder, Dr. Martinez stated that his "diagnostic impression" was
that Gonzalez exhibited "adult anti-social behavior" and suffered from "delusional disorder,
jealous type," which is "when a person has an irrational belief that is arrived at by making
incorrect assumptions or inferences." After reviewing the legal definitions of "sudden
passion" and "adequate cause," Dr. Martinez opined that "it appeared that sudden passion
applied in the description of the events" as relayed to him by Gonzalez. On cross-examination, Dr. Martinez acknowledged that, even with the benefit of multiple interviews
and examinations, he could not testify as to Gonzalez's "mental status" at the time he killed
Sasek; nor could he state whether Gonzalez "had a factual and rational understanding of
the surroundings at the time the event occurred."

 The jury found against Gonzalez on the issue of sudden passion and sentenced him
to life imprisonment. (1) See id. § 12.42(d). This appeal followed.

II. Discussion

A. Evidentiary Sufficiency

 By his second issue, Gonzalez argues that the evidence was legally and factually
insufficient to support the jury's finding that, in causing Sasek's death, he was not "under
the immediate influence of sudden passion arising from an adequate cause." See Tex.
Penal Code Ann. § 19.02(d).

 1. Standard of Review

 When conducting a legal sufficiency review regarding a defendant's affirmative
defense or an issue on which the defendant had the burden of proof, we review the
evidence in the light most favorable to the verdict and reverse only if the evidence
conclusively establishes the opposite. See Wheat v. State, 165 S.W.3d 802, 806 n.6 (Tex.
App.-Texarkana 2005, pet. dism'd); Howard v. State, 145 S.W.3d 327, 331 (Tex.
App.-Fort Worth 2004, no pet.); Cover v. State, 913 S.W.2d 611, 619 (Tex. App.-Tyler
1995, pet. ref'd). We review the legal sufficiency of the evidence to support the jury's
rejection of the defendant's issue under a two-part test. See Clark v. State, 190 S.W.3d
59, 62 (Tex. App.-Amarillo 2005, no pet.); Cleveland v. State, 177 S.W.3d 374, 388 (Tex.
App.-Houston [1st Dist.] 2005, pet. ref'd) (en banc); Ballard v. State, 161 S.W.3d 269, 272
(Tex. App.-Texarkana 2005), aff'd, 193 S.W.3d 916 (Tex. Crim. App. 2006). First, we
examine the record for evidence that supports the jury's rejection of the defendant's issue
while ignoring all evidence to the contrary. See Clark, 190 S.W.3d at 62; Cleveland, 177
S.W.3d at 388; Ballard, 161 S.W.3d at 272. Second, if there is no evidence to support the
jury's rejection of the defendant's issue, we then examine whether the record supports the
defendant's issue as a matter of law. See Clark, 190 S.W.3d at 62; Cleveland, 177
S.W.3d at 388; Ballard, 161 S.W.3d at 272. (2)

 When conducting a factual sufficiency review regarding an issue on which the
defendant had the burden of proof, we review all of the evidence in a neutral light. See
Clark, 190 S.W.3d at 63; Cleveland, 177 S.W.3d at 390; Wheat, 165 S.W.3d at 807 n.6. 
We then determine whether the judgment rendered is manifestly unjust or against the great
weight and preponderance of the evidence. See Edwards v. State, 106 S.W.3d 833, 843
(Tex. App.-Dallas 2003, pet. ref'd); Cleveland, 177 S.W.3d at 390; Wheat, 165 S.W.3d at
807 n.6.

 2. Applicable Law

 During the punishment phase of the trial, a defendant found guilty of murder may
argue that he "caused the death while under the immediate influence of sudden passion
arising from an adequate cause." Tex. Penal Code Ann. § 19.02(d). "Sudden passion" is
"passion directly caused by and arising out of provocation by the individual killed or another
acting with the person killed which passion arises at the time of the offense and is not
solely the result of former provocation." Id. § 19.02(a)(2). "Adequate cause" is a "cause
that would commonly produce a degree of anger, rage, resentment, or terror in a person
of ordinary temper, sufficient to render the mind incapable of cool reflection." Id. §
19.02(a)(1). Sudden passion is a mitigating circumstance that, if found by the jury to have
been proven by a preponderance of the evidence, reduces the offense from a first-degree
felony to a second-degree felony. Id. § 19.02(c), (d); McKinney v. State, 179 S.W.3d 565,
569 (Tex. Crim. App. 2005).

 3. Analysis

 The record contains ample evidence supporting the jury's rejection of Gonzalez's
sudden passion issue, including: (1) Marsha's testimony that Gonzalez is "short
tempered"; (2) Douglas's testimony that Gonzalez would "beat [Sasek's children] up for
useless reasons"; and (3) Siscoe's testimony that, when she tried to visit her sister,
Gonzalez beat her, put a gun to her head, handcuffed her to a bed and left her there for
several hours. This evidence established that Gonzalez has a history of reacting violently
to minor provocations. Additionally, Gonzalez himself testified that he and Sasek "calm[ed]
down a little bit" at one point during their altercation, and that he was able to ask Sasek
several questions between the time she allegedly admitted her infidelity and the time
Gonzalez shot her. This militates against a finding that Gonzalez was "incapable of cool
reflection." See Tex. Penal Code Ann. § 19.02(a)(1). We find that the evidence was
legally sufficient to support the jury's rejection of Gonzalez's sudden passion issue. See
Clark, 190 S.W.3d at 62; Cleveland, 177 S.W.3d at 388; Ballard, 161 S.W.3d at 272.

 In his factual sufficiency argument, Gonzalez contends that the evidence was
undisputed that he acted "under . . . immediate influence . . . because his reaction took
place right after he listened to the tape" of what he believed to be his wife having sexual
relations with another man. However, Gonzalez was not clear in his testimony about when
he first listened to the tape. Additionally, he testified that he "could not identify" the sounds
on the tape when he listened to it, but that he began having suspicions about his wife's
behavior during "the past five months before May 6, 2007." It is the jury's sole
responsibility to judge the credibility of witnesses, and the jury is free to believe or
disbelieve any portion of a witness's testimony. Cain v. State, 958 S.W.2d 404, 408-09
(Tex. Crim. App. 1997); Ortega v. State, 207 S.W.3d 911, 920 (Tex. App.-Corpus Christi
2006, no pet.). The jury was free to disbelieve Gonzalez's assertion that his rage "ar[ose]
at the time of the offense and [wa]s not solely the result of former provocation." See Tex.
Penal Code Ann. § 19.02(a)(1). More fundamentally, the jury was also free to disbelieve
Gonzalez's uncorroborated testimony that Sasek actually admitted to having extramarital
sexual relationships, especially in light of Dr. Martinez's testimony that Gonzalez suffered
from "delusional disorder, jealous type." See Cain, 958 S.W.2d at 408-09; Ortega, 207
S.W.3d at 920. After viewing all the evidence in a neutral light, we conclude that the jury's
negative finding on Gonzalez's sudden passion issue was not manifestly unjust or against
the great weight and preponderance of the evidence. See Edwards, 106 S.W.3d at 843;
Cleveland, 177 S.W.3d at 390; Wheat, 165 S.W.3d at 807.

 Gonzalez's second issue is overruled.

B. Jury Charge Error

 1. Instruction on Mens Rea

 By his first issue, Gonzalez contends that the jury instructions "expand the basis
upon which the jury may find [him] guilty of murder." Gonzalez's trial counsel did not object
to the jury charge on this basis at trial. When reviewing unobjected-to jury charge error,
we must first determine whether the charge was erroneous. See Tolbert v. State, 306
S.W.3d 776, 779 (Tex. Crim. App. 2010). If we determine that error occurred, we then
consider whether the error caused egregious harm. Almanza v. State, 686 S.W.2d 157,
171 (Tex. Crim. App. 1985) (op. on reh'g). Egregious harm will be found only if the error
deprived the defendant of a fair and impartial trial. Ex parte Smith, 309 S.W.3d 53, 63
(Tex. Crim. App. 2010) (citing Almanza, 686 S.W.2d at 171).

 Gonzalez specifically contends that, although the indictment alleged that he
"intentionally or knowingly" caused Sasek's death, the prosecutor omitted the words "or
knowingly" when reading the indictment aloud to the jury during formal arraignment prior
to trial. Gonzalez argues that this constituted an amendment of the indictment or an
"abandonment" by the State of its allegation that Gonzalez "knowingly" caused Sasek's
death. Therefore, according to Gonzalez, the jury charge erroneously permitted the jury
to convict Gonzalez if it found that he had "intentionally or knowingly" caused Sasek's
death. Gonzalez argues that the inclusion of the words "or knowingly" in the jury charge
was egregious error and deprived him of a fair trial in violation of the United States and
Texas Constitutions. See U.S. Const. amend. VI; Tex. Const. art. I, § 10.

 Gonzalez is correct that the jury charge may not expand upon the allegations made
in the charging instrument. See, e.g., Garcia v. State, 640 S.W.2d 939, 941 (Tex. Crim.
App. 1982) ("[W]here the charge attempts to apply the law to the facts by including one or
more unpled mental states, as in this case, fundamental error ensues."). He is further
correct, and the State does not dispute, that the prosecutor omitted the words "or
knowingly" when reading the indictment aloud to the jury. He is incorrect, however, in
claiming that the prosecutor's apparently inadvertent omission effectively amended the
indictment or reflected the State's "abandonment" of the "knowingly" mental state. In fact,
an indictment may be effectively amended only by physical interlineation of the original
document itself, or by the introduction into the record of an amended photocopy of the
original document. Riney v. State, 28 S.W.3d 561, 565-66 (Tex. Crim. App. 2000)
(construing Tex. Code Crim. Proc. Ann. arts. 28.10, 28.11 (Vernon 2006)). Because this
procedure was not followed, the original indictment was never amended, and the jury
charge was therefore not erroneous in tracking the language of the original indictment. We
further conclude that the State did not "abandon" the "knowingly" mental state as one upon
which the jury could convict Gonzalez. We overrule Gonzalez's first issue.

 2. Instruction on Criminally Negligent Homicide

 By his third issue, Gonzalez argues that the trial court erred by declining to include
in the jury charge his requested instruction on criminally negligent homicide. In reviewing
the denial of a requested jury instruction, we determine first if the denial was error. Arline
v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986); Jester v. State, 64 S.W.3d 553, 556
(Tex. App.-Texarkana 2001, no pet.). If we find error, we then perform a harmless error
review. Almanza, 686 S.W.2d at 171.

 Courts use a two-pronged test to determine whether a defendant is entitled to an
instruction on a lesser-included offense. See Guzman v. State, 188 S.W.3d 185, 188 (Tex.
Crim. App. 2006); Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). The first
step is to determine whether an offense is a lesser-included offense of the alleged offense.
Hall v. State, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007); Salinas, 163 S.W.3d at 741.
This determination is a question of law and does not depend on the evidence to be
produced at the trial. Hall, 225 S.W.3d at 535. Here, it is undisputed that criminally
negligent homicide is a lesser-included offense of murder. See Saunders v. State, 840
S.W.2d 390, 391 (Tex. Crim. App. 1992).

 The second step is to determine if there is some evidence that would permit a
rational jury to find that the defendant is guilty of the lesser offense, but not guilty of the
greater. Hall, 225 S.W.3d at 536; Salinas, 163 S.W.3d at 741; Feldman v. State, 71
S.W.3d 738, 750 (Tex. Crim. App. 2002). Anything more than a scintilla of evidence may
be sufficient to entitle a defendant to a charge on the lesser offense. Hall, 225 S.W.3d at
536. If the evidence raises the issue of a lesser-included offense, a jury charge must be
given based on that evidence, "whether produced by the State or the defendant and
whether it be strong, weak, unimpeached, or contradicted." Rousseau v. State, 855
S.W.2d 666, 672 (Tex. Crim. App. 1993) (quoting Bell v. State, 693 S.W.2d 434, 442 (Tex.
Crim. App. 1985)). However, "it is not enough that the jury may disbelieve crucial evidence
pertaining to the greater offense, but rather, there must be some evidence directly
germane to the lesser-included offense for the finder of fact to consider before an
instruction on a lesser-included offense is warranted." Hampton v. State, 109 S.W.3d 437,
441 (Tex. Crim. App. 2003).

 Criminally negligent homicide involves causing the death of another by criminal
negligence. Tex. Penal Code Ann. § 19.05(a). A person is criminally negligent when he
ought to be aware of a substantial and unjustifiable risk that the circumstances surrounding
his conduct exist or the result will occur. Id. § 6.03(d) (Vernon 2003). Before a charge on
criminally negligent homicide is required, the record must contain evidence showing an
unawareness of the risk. Mendieta v. State, 706 S.W.2d 651, 652 (Tex. Crim. App. 1986).

 Gonzalez notes that "there was no evidence that he knew the gun was loaded" and
he argues that "[t]here was direct evidence that [he] may not have been aware of the risk
involved" with firing the gun at Sasek. We disagree. Gonzalez did not testify that he was
unaware that the gun he fired at Sasek was loaded. In fact, there was no evidence
adduced at trial, direct or indirect, indicating that Gonzalez was unaware of the risk
involved in firing the gun at Sasek. See id. We therefore conclude that the trial court did
not err by not charging the jury with an instruction as to criminally negligent homicide. We
overrule Gonzalez's third issue.

C. Cumulative Error

 By his fourth issue, Gonzalez claims that he was deprived of a fair trial due to the
"combined effect" of several alleged errors during trial. (3) Gonzalez notes that courts in the
states of Washington and California have adopted the "cumulative error doctrine" under
which "an appellate court may reverse a defendant's conviction when the combined effect
of errors during trial effectively denied the defendant her right to a fair trial, even if each
error standing alone would be harmless." See State v. Weber, 149 P.3d 646, 660 (Wash.
2006); People v. Hill, 952 P.2d 673, 679 (Cal. 1998) (finding that "cumulative prejudice
flowing from the combination of prosecutorial misconduct and other errors rendered
defendant's trial fundamentally unfair" and reversing judgment of guilt); see United States
v. Bell, 367 F.3d 452, 471 (5th Cir. 2004) ("The cumulative error doctrine provides relief
only when constitutional errors so 'fatally infect the trial' that they violated the trial's
'fundamental fairness.'"). Citing Lawrence v. State, 240 S.W.3d 912, 918 n.24 (Tex. Crim.
App. 2007), for the proposition that courts of appeals "may rely upon the decis[i]ons of
courts of other jurisdictions," Gonzalez urges that we apply the "cumulative error doctrine"
here and find that he was deprived of a fair trial. Assuming, but not deciding, that the
cumulative error doctrine is the law of this State, we nevertheless find that Gonzalez has
not established that he was deprived of a fair trial because he has pointed to no single
reversible error. See Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999)
("It is conceivable that a number of errors may be found harmful in their cumulative
effect. . . .  But, we are aware of no authority holding that non-errors may in their
cumulative effect cause error."). Gonzalez's fourth issue is overruled.

III. Conclusion

 We affirm the judgment of the trial court.




 ________________________

 DORI CONTRERAS GARZA

 Justice


Do not publish.

Tex. R. App. P. 47.2(b)

Delivered and filed the

31st day of August, 2010. 
1. The jury also found that Gonzalez had previously been convicted of two felonies. Accordingly, the
minimum end of the applicable punishment range was enhanced from five years' imprisonment to twenty-five
years. See Tex. Penal Code Ann. §§ 12.32(a), 12.42(d) (Vernon Supp. 2009).
2. In determining whether the defendant's issue was proven as a matter of law, we do not consider
evidence that was subject to the jury's assessment of credibility. Cleveland v. State, 177 S.W.3d 374, 388-89
(Tex. App.-Houston [1st Dist.] 2005, pet. ref'd) (en banc).
3. Gonzalez specifically complains of the following alleged errors: "The trial court expanded the basis
of mens rea upon which the jury could convict . . . In final argument the prosecutor called the defendant a
leech and a worm, made arguments similar to community expectations, in the context of the community [sic],
argued outside the evidence that there were murders happening every day, and argued punishment at
guilt/innocence."