

NUMBER 13-08-00624-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **FRANCISCO SALAZAR GONZALEZ,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

**On appeal from the 138th District Court
of Cameron County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Justice Garza**

Appellant, Francisco Salazar Gonzalez, was convicted of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003). The jury found Gonzalez to be a habitual felony offender and sentenced him to life imprisonment. *See id.* § 12.42(d) (Vernon Supp. 2009). By six issues on appeal, which we characterize as four, Gonzalez argues that: (1) the trial court's jury instructions "expand[ed] the basis upon which the jury may [have] f[ou]nd [him] guilty of murder"; (2) the evidence was legally and factually insufficient to support the jury's finding against him on the issue of sudden passion; (3) the trial court erred by failing to submit a jury instruction as to criminally negligent homicide; and (4) he was deprived of a fair trial due to the "cumulative error" of the trial court. We affirm.

# I. BACKGROUND

Gonzalez was indicted for the murder of his wife of nearly ten years, Toni Lyn Sasek Gonzalez ("Sasek"). This was the second marriage for both Gonzalez and Sasek, and Sasek had three minor children from her prior marriage. Testimony at trial established that Gonzalez and Sasek enjoyed a good relationship during the early years of their marriage, but that the relationship changed at some point, in part because Gonzalez became increasingly suspicious that Sasek was having sexual relationships with other men. So concerned was Gonzalez that his wife was unfaithful that he placed several audio recording devices around the family's house in Harlingen, Texas, in an attempt to prove her infidelity.

At some point, Gonzalez discovered "moans" on one of the audio recordings. Gonzalez testified at trial that he "could not identify what those moans meant or who they belonged to"; nevertheless, he confronted his wife about her alleged infidelity on May 6, 2007. Gonzalez testified as follows:

> I went inside the house and I talked to Toni. And we started talking, and I asked her who had been there just casually, and she said no one. And then I asked her again, who had been there. . . . I kept on asking her, and she, third time she said, no one. And she was getting a little bit flustered that I was asking her. . . . I told her not to lie to me, that I had proof that someone had been there. . . . I told her to tell me the truth. She wouldn't. She said no one had been there. . . . I asked her to tell the truth one more time, and she said she is telling me the truth, and then . . . I slapped her, she slaps me back. She pulls on my shirt, I try to get her away from me. We end up on the bed and she kicks me . . . . Then we calm down a little bit, then we start talking. . . . And I asked her, I keep on repeating that question, who was here? And she keeps on avoiding me. . . . [W]e start talking some more, and she says that she has been doing this for a while, but she is not mentioning any names, and I want to know who. . . . And I am throwing out names and she is not answering to any of them. . . . And finally I get her to say yes, but you'll have to leave the house, you can't stay here any more after that. . . .

Gonzalez testified that the couple then left the house, went into his truck which was parked outside, and continued to argue. When asked by defense counsel "at what point do you get the gun?", Gonzalez replied that "[t]he gun was always in my back pocket—yes, in my back pocket at that time, and then I moved it from my back pocket to my side waistband." Gonzalez continued his testimony:

2

A. [Gonzalez]    Well, we start driving out, and we are still arguing. Finally I stopped in the driveway and I asked her some more questions, basic questions like who are they? Who is it? Are there several? Are you doing the same things that we were fantasizing about? And she answers some questions, but she doesn't answer the ones I want to know the most.

She answers yes, I have been doing some of the stuff that we have been fantasizing about, but she won't tell me who, with who. . . . I said, look, just tell me who it is, we'll go see the tape, and then I'll leave.

Q. [Defense counsel]    And then what happens?

A.    She tells me who it is.

Q.    Now, what happens next, if anything?

A.    We start arguing and fighting some more. . . . Like why, why do you do this to me? And she couldn't tell me a specific reason why, and I said don't you love me any more? And she told me she does love me, and we would argue about that. How can you love me and do this? And she couldn't answer.

Q.    Then what happens next?

A.    Then we start mentioning—I start mentioning, what are those things that you do that we were fantasizing about?

Q.    And what does she respond?

A.    To the trios and gangbangs.

Q.    And what happens next?

A.    I get pretty angry.

Q.    And then?

A.    Then I slap her. I said tell me, I want her to know that I am serious about I wanted to know who it is, and she starts hitting me back.

Q.    And then what happens?

A.    Then she tries to exit, and I pushed the button on my door for the lock. I said, no, you are going to stay and you are going to tell me who it is, who you have been doing this with. A lot of

3

Q.         yelling.  And then she opened the door and tried to exit, and I shot her.

Q.         Now, when this happened, what was going through your mind?

A.         I was pretty angry, pretty enraged, pretty betrayed.  I felt like ten years, it's nine years that I have been with her, all the work, everything, for nothing.

    . . . .

Q.         What did you intend, if anything?

A.         I wanted to find out what was going on, that's what I really wanted to find out more than anything else.  I wanted to find out who she was fooling around with and why.  That's it.

Gonzalez stated that he then called 911 and went "into hiding" on his property.  He eventually turned himself in and gave a sworn, written statement to police in which he stated that, during the altercation, he "shot [Sasek] in the stomach" and that he "shot her a second time in the left back shoulder blade."

At the charge conference, the trial court denied Gonzalez's request for an instruction on the lesser-included offense of criminally negligent homicide.  *See id.* § 19.05 (Vernon 2003).  The jury then found Gonzalez guilty of murder.

At the sentencing phase of trial, all evidence from the guilt-innocence phase of trial was re-admitted.  Defense counsel then asked the jury to find that Gonzalez caused Sasek's death while "under the immediate influence of sudden passion arising from an adequate cause."  *See* TEX. PENAL CODE ANN. § 19.02(d) ("At the punishment stage of a trial, [a murder] defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause.  If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.").

The jury heard from various witnesses during the punishment phase.  Sheila King, Sasek's sister, testified that Sasek's children had once told her that Gonzalez "would tell them that if his mother ever left him, that he was going to kill her, and when he got out of

4

jail, he was going to kill them." Kirsten Davenport, Sasek's eldest child, testified that:

> Living with [Gonzalez] for about ten years was really, really hard, was a nightmare actually. He verbally abused me and my sister and my brother. . . . There was a lot of physical abuse from the time that he married my mom, and there were a couple of instances where he would beat me . . . he used a cutting board actually, and I had bruises all over my lower body [when] I was either between fifth or sixth grade, I was pretty young.

According to Kirsten, Gonzalez "would threaten me and my sister, that if we would ever turn him in for child abuse, that he would come after us. . . . He said he would kill us." Kirsten stated she never called the police about any of the things Gonzalez did because she was afraid that she "would be punished for that."

Marsha Davenport, Sasek's younger daughter, testified without objection that Gonzalez "is an evil man." She stated that "he would punch us, hit us, he would pull our hair, just the typical stuff. . . . He called us names. He really put down my brother a lot, like he would yell at us a lot. It was over-anger, it wasn't, like necessary. . . . He's just short tempered, I guess." Douglas Davenport, Sasek's youngest child, testified that Gonzalez "is pathetic because he used to beat us up for useless reasons, and he treated us like crap."

Gonzalez's ex-wife, Esther Siscoe, testified about an incident where Gonzalez refused to let her visit her sister. According to Siscoe, Gonzalez "hit me, beat me, left me black and blue, my whole face was swollen." Siscoe further stated that Gonzalez "put a gun to my head, he handcuffed me to the bed, he left me there while he ran an errand, and I think it was like six or seven hours when he came back." The next day, Gonzalez took Siscoe to her sister's house, at which point Siscoe "told him to leave the house or else I was going to call the cops. He tried to talk to me to make me go back with him, and I said no. I didn't go back, and thank God I am here today. . . . I never saw him again."

Javier Martinez, M.D., a licensed psychologist, testified for the defense. Dr. Martinez stated that he was asked to offer a professional opinion as to whether Gonzalez acted with "sudden passion" in causing Sasek's death. He interviewed and examined Gonzalez, and stated that Gonzalez appeared to be "troubled, very troubled by the

problems within [his] relationship" with Sasek. When asked if he was able to make any diagnosis of a mental disorder, Dr. Martinez stated that his "diagnostic impression" was that Gonzalez exhibited "adult anti-social behavior" and suffered from "delusional disorder, jealous type," which is "when a person has an irrational belief that is arrived at by making incorrect assumptions or inferences." After reviewing the legal definitions of "sudden passion" and "adequate cause," Dr. Martinez opined that "it appeared that sudden passion applied in the description of the events" as relayed to him by Gonzalez. On cross-examination, Dr. Martinez acknowledged that, even with the benefit of multiple interviews and examinations, he could not testify as to Gonzalez's "mental status" at the time he killed Sasek; nor could he state whether Gonzalez "had a factual and rational understanding of the surroundings at the time the event occurred."

The jury found against Gonzalez on the issue of sudden passion and sentenced him to life imprisonment.[1]  *See id.* § 12.42(d).  This appeal followed.

## II. Discussion

### A. Evidentiary Sufficiency

By his second issue, Gonzalez argues that the evidence was legally and factually insufficient to support the jury's finding that, in causing Sasek's death, he was not "under the immediate influence of sudden passion arising from an adequate cause." *See* Tex. Penal Code Ann. § 19.02(d).

#### 1. Standard of Review

When conducting a legal sufficiency review regarding a defendant's affirmative defense or an issue on which the defendant had the burden of proof, we review the evidence in the light most favorable to the verdict and reverse only if the evidence conclusively establishes the opposite. *See Wheat v. State*, 165 S.W.3d 802, 806 n.6 (Tex. App.–Texarkana 2005, pet. dism'd); *Howard v. State*, 145 S.W.3d 327, 331 (Tex.

---

[1] The jury also found that Gonzalez had previously been convicted of two felonies. Accordingly, the minimum end of the applicable punishment range was enhanced from five years' imprisonment to twenty-five years. *See* Tex. Penal Code Ann. §§ 12.32(a), 12.42(d) (Vernon Supp. 2009).

6

App.–Fort Worth 2004, no pet.); *Cover v. State*, 913 S.W.2d 611, 619 (Tex. App.–Tyler 1995, pet. ref'd). We review the legal sufficiency of the evidence to support the jury's rejection of the defendant's issue under a two-part test. *See Clark v. State*, 190 S.W.3d 59, 62 (Tex. App.–Amarillo 2005, no pet.); *Cleveland v. State*, 177 S.W.3d 374, 388 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (en banc); *Ballard v. State*, 161 S.W.3d 269, 272 (Tex. App.–Texarkana 2005), *aff'd*, 193 S.W.3d 916 (Tex. Crim. App. 2006). First, we examine the record for evidence that supports the jury's rejection of the defendant's issue while ignoring all evidence to the contrary. *See Clark*, 190 S.W.3d at 62; *Cleveland*, 177 S.W.3d at 388; *Ballard*, 161 S.W.3d at 272. Second, if there is no evidence to support the jury's rejection of the defendant's issue, we then examine whether the record supports the defendant's issue as a matter of law. *See Clark*, 190 S.W.3d at 62; *Cleveland*, 177 S.W.3d at 388; *Ballard*, 161 S.W.3d at 272.[2]

When conducting a factual sufficiency review regarding an issue on which the defendant had the burden of proof, we review all of the evidence in a neutral light. *See Clark*, 190 S.W.3d at 63; *Cleveland*, 177 S.W.3d at 390; *Wheat*, 165 S.W.3d at 807 n.6. We then determine whether the judgment rendered is manifestly unjust or against the great weight and preponderance of the evidence. *See Edwards v. State*, 106 S.W.3d 833, 843 (Tex. App.–Dallas 2003, pet. ref'd); *Cleveland*, 177 S.W.3d at 390; *Wheat*, 165 S.W.3d at 807 n.6.

### 2.    Applicable Law

During the punishment phase of the trial, a defendant found guilty of murder may argue that he "caused the death while under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not

---

[2] In determining whether the defendant's issue was proven as a matter of law, we do not consider evidence that was subject to the jury's assessment of credibility. *Cleveland v. State*, 177 S.W.3d 374, 388-89 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (en banc).

solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Sudden passion is a mitigating circumstance that, if found by the jury to have been proven by a preponderance of the evidence, reduces the offense from a first-degree felony to a second-degree felony. *Id.* § 19.02(c), (d); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).

### 3. Analysis

The record contains ample evidence supporting the jury's rejection of Gonzalez's sudden passion issue, including: (1) Marsha's testimony that Gonzalez is "short tempered"; (2) Douglas's testimony that Gonzalez would "beat [Sasek's children] up for useless reasons"; and (3) Siscoe's testimony that, when she tried to visit her sister, Gonzalez beat her, put a gun to her head, handcuffed her to a bed and left her there for several hours. This evidence established that Gonzalez has a history of reacting violently to minor provocations. Additionally, Gonzalez himself testified that he and Sasek "calm[ed] down a little bit" at one point during their altercation, and that he was able to ask Sasek several questions between the time she allegedly admitted her infidelity and the time Gonzalez shot her. This militates against a finding that Gonzalez was "incapable of cool reflection." *See* TEX. PENAL CODE ANN. § 19.02(a)(1). We find that the evidence was legally sufficient to support the jury's rejection of Gonzalez's sudden passion issue. *See Clark*, 190 S.W.3d at 62; *Cleveland*, 177 S.W.3d at 388; *Ballard*, 161 S.W.3d at 272.

In his factual sufficiency argument, Gonzalez contends that the evidence was undisputed that he acted "under . . . immediate influence . . . because his reaction took place right after he listened to the tape" of what he believed to be his wife having sexual relations with another man. However, Gonzalez was not clear in his testimony about when he first listened to the tape. Additionally, he testified that he "could not identify" the sounds on the tape when he listened to it, but that he began having suspicions about his wife's behavior during "the past five months before May 6, 2007." It is the jury's sole

8

responsibility to judge the credibility of witnesses, and the jury is free to believe or disbelieve any portion of a witness's testimony. *Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997); *Ortega v. State*, 207 S.W.3d 911, 920 (Tex. App.–Corpus Christi 2006, no pet.). The jury was free to disbelieve Gonzalez's assertion that his rage "ar[ose] at the time of the offense and [wa]s not solely the result of former provocation." *See* TEX. PENAL CODE ANN. § 19.02(a)(1). More fundamentally, the jury was also free to disbelieve Gonzalez's uncorroborated testimony that Sasek actually admitted to having extramarital sexual relationships, especially in light of Dr. Martinez's testimony that Gonzalez suffered from "delusional disorder, jealous type." *See Cain*, 958 S.W.2d at 408-09; *Ortega*, 207 S.W.3d at 920. After viewing all the evidence in a neutral light, we conclude that the jury's negative finding on Gonzalez's sudden passion issue was not manifestly unjust or against the great weight and preponderance of the evidence. *See Edwards*, 106 S.W.3d at 843; *Cleveland*, 177 S.W.3d at 390; *Wheat*, 165 S.W.3d at 807.

Gonzalez's second issue is overruled.

## B.      Jury Charge Error

### 1.      Instruction on Mens Rea

By his first issue, Gonzalez contends that the jury instructions "expand the basis upon which the jury may find [him] guilty of murder." Gonzalez's trial counsel did not object to the jury charge on this basis at trial. When reviewing unobjected-to jury charge error, we must first determine whether the charge was erroneous. *See Tolbert v. State*, 306 S.W.3d 776, 779 (Tex. Crim. App. 2010). If we determine that error occurred, we then consider whether the error caused egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Egregious harm will be found only if the error deprived the defendant of a fair and impartial trial. *Ex parte Smith*, 309 S.W.3d 53, 63 (Tex. Crim. App. 2010) (citing *Almanza*, 686 S.W.2d at 171).

Gonzalez specifically contends that, although the indictment alleged that he "intentionally or knowingly" caused Sasek's death, the prosecutor omitted the words "or knowingly" when reading the indictment aloud to the jury during formal arraignment prior

9

to trial. Gonzalez argues that this constituted an amendment of the indictment or an "abandonment" by the State of its allegation that Gonzalez "knowingly" caused Sasek's death. Therefore, according to Gonzalez, the jury charge erroneously permitted the jury to convict Gonzalez if it found that he had "intentionally or knowingly" caused Sasek's death. Gonzalez argues that the inclusion of the words "or knowingly" in the jury charge was egregious error and deprived him of a fair trial in violation of the United States and Texas Constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10.

Gonzalez is correct that the jury charge may not expand upon the allegations made in the charging instrument. *See, e.g., Garcia v. State*, 640 S.W.2d 939, 941 (Tex. Crim. App. 1982) ("[W]here the charge attempts to apply the law to the facts by including one or more unpled mental states, as in this case, fundamental error ensues."). He is further correct, and the State does not dispute, that the prosecutor omitted the words "or knowingly" when reading the indictment aloud to the jury. He is incorrect, however, in claiming that the prosecutor's apparently inadvertent omission effectively amended the indictment or reflected the State's "abandonment" of the "knowingly" mental state. In fact, an indictment may be effectively amended only by physical interlineation of the original document itself, or by the introduction into the record of an amended photocopy of the original document. *Riney v. State*, 28 S.W.3d 561, 565-66 (Tex. Crim. App. 2000) (construing TEX. CODE CRIM. PROC. ANN. arts. 28.10, 28.11 (Vernon 2006)). Because this procedure was not followed, the original indictment was never amended, and the jury charge was therefore not erroneous in tracking the language of the original indictment. We further conclude that the State did not "abandon" the "knowingly" mental state as one upon which the jury could convict Gonzalez. We overrule Gonzalez's first issue.

### 2. Instruction on Criminally Negligent Homicide

By his third issue, Gonzalez argues that the trial court erred by declining to include in the jury charge his requested instruction on criminally negligent homicide. In reviewing the denial of a requested jury instruction, we determine first if the denial was error. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986); *Jester v. State*, 64 S.W.3d 553, 556

10

(Tex. App.–Texarkana 2001, no pet.). If we find error, we then perform a harmless error review. *Almanza*, 686 S.W.2d at 171.

Courts use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser-included offense. *See Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006); *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). The first step is to determine whether an offense is a lesser-included offense of the alleged offense. *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007); *Salinas*, 163 S.W.3d at 741. This determination is a question of law and does not depend on the evidence to be produced at the trial. *Hall*, 225 S.W.3d at 535. Here, it is undisputed that criminally negligent homicide is a lesser-included offense of murder. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).

The second step is to determine if there is some evidence that would permit a rational jury to find that the defendant is guilty of the lesser offense, but not guilty of the greater. *Hall*, 225 S.W.3d at 536; *Salinas*, 163 S.W.3d at 741; *Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002). Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on the lesser offense. *Hall*, 225 S.W.3d at 536. If the evidence raises the issue of a lesser-included offense, a jury charge must be given based on that evidence, "whether produced by the State or the defendant and whether it be strong, weak, unimpeached, or contradicted." *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993) (quoting *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)). However, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003).

Criminally negligent homicide involves causing the death of another by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a). A person is criminally negligent when he ought to be aware of a substantial and unjustifiable risk that the circumstances surrounding

11

his conduct exist or the result will occur. *Id.* § 6.03(d) (Vernon 2003). Before a charge on criminally negligent homicide is required, the record must contain evidence showing an unawareness of the risk. *Mendieta v. State*, 706 S.W.2d 651, 652 (Tex. Crim. App. 1986).

Gonzalez notes that "there was no evidence that he knew the gun was loaded" and he argues that "[t]here was direct evidence that [he] may not have been aware of the risk involved" with firing the gun at Sasek. We disagree. Gonzalez did not testify that he was unaware that the gun he fired at Sasek was loaded. In fact, there was no evidence adduced at trial, direct or indirect, indicating that Gonzalez was unaware of the risk involved in firing the gun at Sasek. *See id.* We therefore conclude that the trial court did not err by not charging the jury with an instruction as to criminally negligent homicide. We overrule Gonzalez's third issue.

## C.     Cumulative Error

By his fourth issue, Gonzalez claims that he was deprived of a fair trial due to the "combined effect" of several alleged errors during trial.[3] Gonzalez notes that courts in the states of Washington and California have adopted the "cumulative error doctrine" under which "an appellate court may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant her right to a fair trial, even if each error standing alone would be harmless." *See State v. Weber*, 149 P.3d 646, 660 (Wash. 2006); *People v. Hill*, 952 P.2d 673, 679 (Cal. 1998) (finding that "cumulative prejudice flowing from the combination of prosecutorial misconduct and other errors rendered defendant's trial fundamentally unfair" and reversing judgment of guilt); *see United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004) ("The cumulative error doctrine provides relief only when constitutional errors so 'fatally infect the trial' that they violated the trial's 'fundamental fairness.'"). Citing *Lawrence v. State*, 240 S.W.3d 912, 918 n.24 (Tex. Crim.

---

[3] Gonzalez specifically complains of the following alleged errors: "The trial court expanded the basis of mens rea upon which the jury could convict . . . In final argument the prosecutor called the defendant a leech and a worm, made arguments similar to community expectations, in the context of the community [sic], argued outside the evidence that there were murders happening every day, and argued punishment at guilt/innocence."

App. 2007), for the proposition that courts of appeals "may rely upon the decis[i]ons of courts of other jurisdictions," Gonzalez urges that we apply the "cumulative error doctrine" here and find that he was deprived of a fair trial. Assuming, but not deciding, that the cumulative error doctrine is the law of this State, we nevertheless find that Gonzalez has not established that he was deprived of a fair trial because he has pointed to no single reversible error. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect. . . . But, we are aware of no authority holding that non-errors may in their cumulative effect cause error."). Gonzalez's fourth issue is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
31st day of August, 2010.

13