

# NUMBER 13-17-00561-CR & 13-17-00562-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

SAYED SADAT,                                                        Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

### On appeal from the 299th District Court of Travis County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Longoria and Hinojosa
Memorandum Opinion by Chief Justice Valdez**

In appellate cause number 13-17-00561-CR, appellant Sayed Sadat appeals his

conviction of aggravated kidnapping, a first-degree felony (the aggravated kidnapping

cause) and in appellate cause number 13-17-00562-CR, Sadat appeals his conviction of

aggravated assault, a second-degree felony (the aggravated assault cause).[1] *See* TEX. PENAL CODE ANN. §§ 20.04, 22.02 (West, Westlaw through 2017 1st C.S.). In the aggravated kidnapping cause, Sadat contends by one issue that the trial court improperly rejected his affirmative defense that he voluntarily released the victim in a safe place, which would have reduced the charged offense from a first-degree felony to a second-degree felony. *See id.* § 20.04(d). In the aggravated assault cause, Sadat's court-appointed counsel has filed an *Anders* brief. *See Anders v. California*, 386 U.S. 738, 744 (1967). In both causes, we affirm.

## I.     BACKGROUND

Nicole Cantu, a licensed clinical social worker, testified that on May 17, 2016, while providing social services to Sadat at his apartment, he attacked her. Cantu explained that when she told Sadat she had to leave, he said "No," and as she walked to the door, Sadat hit the back of her head. Cantu explained that when Sadat hit her, she dropped everything she was holding, including her keys, personal cell phone, and work cell phone. Cantu said that the pair struggled as she attempted to reach for the door, but Sadat overpowered her and hit her some more. According to Cantu, she was unable to get to the door, and Sadat bit her three times, once on the left temple, which required stitches.[2]

Cantu testified that Sadat then hit her eye with a screwdriver; however, her eyeglasses prevented a more serious injury from occurring. According to Cantu, at some point, Sadat put the screwdriver down, pinned her shoulders with his knees, grabbed her

---

[1] Both causes are before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2017 1st C.S.).

[2] Cantu testified that Sadat also bit her on her chest and her right breast.

hair, and told her that he would tie her up and keep her there so that she could not call the police. Cantu testified that Sadat "made a statement to the effect of . . . the police have power, America is power or is about power, now I have power over you." Cantu stated that to de-escalate the situation, she reminded Sadat that she cared about him, and he responded by saying that he loved her. Cantu told him she also loved him to keep him calm. Cantu testified that eventually, Sadat told her "No more screaming" and asked her to "Stay there" and to put her "hands behind her head." Cantu said, "[I complied] because I was scared for my life and my safety." According to Cantu, Sadat cleaned her face and asked if she was in pain; Cantu tried to downplay her injuries so that Sadat would believe she was not going to call the police and he would let her go.

Cantu testified that Sadat told her several times to kill him or to take him to the jungle.[3] Cantu explained that although she considered injuring Sadat so that she could "get away or run past him," she "didn't feel like [she] could do so and get out safely because he was between the front door and me. . . ." Cantu said, "he had been so strong earlier overpowering me that I didn't know if I could injure him enough to get out. . . . So [she said,] 'I don't want to kill you, [Sadat].'"

According to Cantu, Sadat apologized for hurting her, continued cleaning her injuries, and then Sadat told her to go to the bathroom because she was bleeding. Cantu said that she thought she might escape if the bathroom had a window, but because Sadat was standing next to her by the sink, she decided not to do so. Cantu stated that she then attempted an escape when Sadat dropped a band aid on the floor. Cantu "thought

---

[3] Sadat is an immigrant from Afghanistan, and he does not speak fluent English. Cantu later explained that Sadat meant to take him to the woods.

3

that was a good opportunity to flee" so she ran quickly out of the bathroom and attempted to close the door behind her, but Sadat blocked the door "very quickly and very fast. . . ." Sadat prevented Cantu from leaving by blocking the front door. Cantu said that the situation "very quickly escalated again and [he] was very angry and firm telling [her], No, you don't leave." Cantu testified that Sadat forced her to stay at the apartment and told her that he would kill her if she called the police.

Cantu testified that she continued to "strategiz[e] about possible ways to escape, but [she] felt like [she] wouldn't try to run again because of how quickly he had angered and escalated again and just how strong he was and overpowering. . . ." Cantu said that during the entire incident, she was in fear for her life, and she did not feel like she could safely get away from Sadat "because of his threats to kill [her] if [she] screamed or [she] ran. . . ." Cantu stated that she decided to wait to escape when she drove him to "the jungle," which she interpreted as meaning taking him to the woods "to kind of hide out." On re-direct examination, Cantu testified that Sadat had her phones, and he showed them to her stating, "Take me to the jungle and I'll give you your phones back."

Cantu testified that because of her appearance, Sadat was concerned about leaving; therefore, she took off her headband, pulled her hair down, and asked for sunglasses to cover her wounds. Cantu explained that she wanted to conceal her wounds so that Sadat "would feel more safe or comfortable allowing me to go outside or to go with him to leave." Cantu said that Sadat then returned her keys, which had a key fob with a panic button, she decided against pushing the panic button because she felt it was too risky. On cross-examination, Sadat's trial counsel asked Cantu what she planned to do when she reached her car, and she replied that she did not believe she could safely flee

4

on foot due to Sadat's strength and that she thought her best course would be to lock him out of the car or in the worst case if she ended up in the car with him, she would jump out of the car. Cantu said, "I thought to myself I'm not worried about getting my phones back or my car or anything. So get out of here with my life."

Cantu stated that Sadat then gathered some of his belongings from his bedroom and kitchen, and he looked outside a few times "like he was looking to see if there were a lot of people around or if it was clear." Cantu explained the ensuing events as follows:

> [He p]icked up his belongings that he was planning to take with him and asked me to follow him out the door. I waited until he instructed me to go out the door. I kind of hesitated wondering if he would go out first or just . . . trying to be very compliant still and cautious; and he said . . . Go out. I don't remember if he had me go ahead of him or if he was ahead of me, but we walked to my car which was parked right outside of his apartment, very close.
>
> . . . .
>
> He asked to put his things in my trunk. I hit the key fob for my car and accidently hit the unlock once. I heard it beep, which only unlocks the driver's side door. And I hit the button to pop the trunk, and so we walked over there, and he put his things into the trunk.
>
> . . . .
>
> I closed the trunk. I was thinking about the possibility of him following me to my side of the car and just worrying or preparing for that possibility, but he ended up walking . . . to the passenger's side when I walked to the driver's side. And then I opened the driver's door and climbed in my car very quickly, closed my door . . . hit the lock button even though only the driver's side should have been locked anyway, but I hit lock just to be safe.
>
> As fast as I could, started the ignition, reversed. He sort of like threw himself toward my passenger door, like kind of onto the car. It was like . . . it surprised him that I was taking off without him like that, and I just continued driving and went on.
>
> I still do not have my phones at that point. He had shown to me that they were in his pocket in the apartment. And so I was planning to drive to

a store down the street or a gas station to call the police and to get far away from him knowing he was on foot, but I felt like I was safe.

Cantu stated that she eventually drove to a gas station where she called 911, and a police officer took her to the hospital. According to Cantu, she was at Sadat's apartment after the assault started for over two hours.

After a bench trial, the trial court found appellant guilty and sentenced him to thirty years' incarceration for the aggravated kidnapping charge and twenty years' incarceration for the aggravated assault charge. This appeal followed.

## II.    THE AGGRAVATED KIDNAPPING CAUSE

By his sole issue in the aggravated kidnapping cause, Sadat contends that the evidence was insufficient to support the trial court's rejection of his defense of releasing the victim in a safe place. The State responds that Sadat did not release Cantu.

### A.    Applicable Law and Standard of Review

If the kidnapper "voluntarily releases the victim in a safe place, the punishment level for aggravated kidnapping is reduced from a first-degree felony to a second-degree felony." *Butcher v. State*, 454 S.W.3d 13, 14 (Tex. Crim. App. 2015) (citing TEX. PENAL CODE ANN. § 20.04(d)). Section 20.04 states that an aggravated kidnapping is a second-degree felony if a defendant proves by a preponderance of the evidence that the defendant voluntarily released a kidnapped victim in a safe place. TEX. PENAL CODE ANN. § 20.04(d).

Although the Texas Court of Criminal Appeals abolished factual sufficiency review as it applies to criminal convictions in *Brooks v. State*, 323 S.W.3d 893, 905–07 (Tex. Crim. App. 2010) (plurality op.), affirmative defenses may be evaluated for both legal and factual sufficiency. *Butcher*, 454 S.W.3d at 14. "In a legal-sufficiency review of an

6

affirmative defense, reviewing courts should first assay the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not." *Id.*; *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). "If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law." *Matlock*, 392 S.W.3d at 667.

> In a factual-sufficiency review of a finding rejecting an affirmative defense, and unlike in a legal-sufficiency review, courts examine the evidence in a neutral light. A finding rejecting a defendant's affirmative defense cannot be overruled unless, "after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased."

*Butcher*, 454 S.W.3d at 14 (internal citations omitted).

The affirmative defense of release in a safe place only applies if the evidence shows that the defendant "performed 'some overt and affirmative act' which brought home to his victim that she had been 'fully released from captivity.'" *Dominguez v. State*, 467 S.W.3d 521, 527 (Tex. App.—San Antonio 2015, pet. ref'd); *Harrell v. State*, 65 S.W.3d 768, 772 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). In addition, the release "must have occurred in a place and manner which realistically conveyed [to the victim] that she was then freed from captivity and in circumstances and surroundings wherein aid was readily available." *Dominguez*, 467 S.W.3d at 528; *Woods v. State*, 301 S.W.3d 327, 331 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The Texas Court of Criminal Appeals has interpreted the term "voluntarily" narrowly as meaning that the defense applies unless the victim escapes or is rescued by the police. *Brown v. State*, 98 S.W.3d 180, 188 (Tex. Crim. App. 2003) (explaining that interpreting the word "voluntary" in section 20.04(d) "is

likely to effectuate the legislative purpose of Section 20.04(d) of encouraging kidnappers to release their kidnap victims"); *Dominguez*, 467 S.W.3d at 528.

## B.    Discussion

Here, Sadat injured Cantu, threatened to kill her, prevented her from leaving his apartment, and told her that if she went to the police he would kill her. After Sadat attacked Cantu, she made sure to follow Sadat's instructions, and when she failed to do so, he became angry and threatening. During the two-hour ordeal, Cantu strategized different methods of escape. And, when Cantu attempted to escape, Sadat became enraged again. Cantu was in fear for her life during the entire incident.

Prior to embarking on their trip to the woods, Sadat expressed concern with allowing Cantu to leave the apartment because of her visible injuries. To alleviate those concerns, Cantu covered the wounds with her hair and a pair of sunglasses, which apparently worked as he then agreed that the pair should leave to the woods. Although Sadat returned Cantu's keys and key fob, he kept her phones. Sadat told Cantu that he would return her phones to her after she drove him to the woods. Cantu indicated that once outside the apartment, she did not feel safe to leave on foot. Cantu used terms such as escape and flee when describing her plans to leave the situation. Cantu planned that she would either lock Sadat out of her car or jump out of the car if she failed in her efforts to lock him out. Cantu stated that she was not concerned with retrieving her phones or keeping her car, and she wanted to "get out of here" with her life.

When describing their exit from the apartment, Cantu explained that she followed Sadat and did everything he told her to do. She said that she attempted to be "compliant." Cantu again followed Sadat's instruction when they arrived at her car, and she thought of

8

possible escape plans. Cantu entered her car "quickly," she locked the doors for her security and safety, and started her car "as fast as [she] could." Sadat "threw himself toward" Cantu's passenger side door, "like onto the car." Cantu said that Sadat was "surprised" that Cantu "was taking off without him."

At no time did Sadat indicate that Cantu was free to leave, either explicitly or implicitly. Nor did he perform some overt act which communicated to Cantu that she had been fully released from captivity. *See Dominguez*, 467 S.W.3d at 527; *Harrell*, 65 S.W.3d at 772. In fact, the evidence supports a finding that Cantu escaped and that Sadat had not planned to release her at that time but had planned for Cantu to take him to the woods against her will. *See Butcher*, 454 S.W.3d at 14; *Matlock*, 392 S.W.3d at 667; *Ballard v. State*, 161 S.W.3d 269, 276 (Tex. App.—Texarkana 2005), *aff'd*, 193 S.W.3d 916 (Tex. Crim. App. 2006) (concluding that the defendant had not released the victim when he left her alone in a running car because in order for the victim "to be free from [the defendant] at that time, there is evidence she would have had to flee, leaving [the defendant] in the store"). Therefore, section 20.04(d) does not apply because the evidence supports a finding that Cantu escaped. *See Brown*, 98 S.W.3d at 188. Accordingly, there is more than a scintilla of evidence to support the trial court's rejection of Sadat's defense, and the evidence is legally sufficient. Moreover, viewing the evidence in a neutral light, the trial court's finding is not against the great weight and preponderance of the evidence. We overrule Sadat's sole issue in the aggravated kidnapping cause.

## C. Conclusion

We affirm the trial court's judgment in the aggravated kidnapping cause.

### III. THE AGGRAVATED ASSAULT CAUSE

9

Pursuant to *Anders v. California*, Sadat's court-appointed appellate counsel has filed a brief and a motion to withdraw with this Court, stating that his review of the record yielded no grounds of reversible error upon which an appeal can be predicated. *See id.* Counsel's brief meets the requirements of *Anders* as it presents a professional evaluation demonstrating why there are no arguable grounds to advance on appeal. *See In re Schulman*, 252 S.W.3d 403, 407 n.9 (Tex. Crim. App. 2008) ("In Texas, an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities.") (citing *Hawkins v. State*, 112 S.W.3d 340, 343–44 (Tex. App.—Corpus Christi 2003, no pet.)); *Stafford v. State*, 813 S.W.2d 503, 510 n.3 (Tex. Crim. App. 1991).

In compliance with *High v. State*, 573 S.W.2d 807, 813 (Tex. Crim. App. [Panel Op.] 1978) and *Kelly v. State*, 436 S.W.3d 313, 319–22 (Tex. Crim. App. 2014), Sadat's counsel carefully discussed why, under controlling authority, there is no reversible error in the trial court's judgment. Sadat's counsel has also informed this Court that Sadat has been (1) notified that counsel has filed an *Anders* brief and a motion to withdraw; (2) provided with copies of both pleadings; (3) informed of his rights to file a pro se response, review the record preparatory to filing that response, and seek discretionary review if we conclude that the appeal is frivolous; and (4) provided with a form motion for pro se access to the appellate record with instructions to file the motion within ten days. *See Anders*, 386 U.S. at 744; *Kelly*, 436 S.W.3d at 319–20, *Stafford*, 813 S.W.2d at 510 n.3; *see also In re Schulman*, 252 S.W.3d at 409 n.23. More than an adequate period of time has passed, and Sadat has not filed a pro se response.[4]

---

[4] The Texas Court of Criminal Appeals has held that "the pro se response need not comply with the rules of appellate procedure in order to be considered. Rather, the response should identify for the

## II.    INDEPENDENT REVIEW

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the case is wholly frivolous.  *Penson v. Ohio*, 488 U.S. 75, 80 (1988).  We have reviewed the entire record and counsel's brief, and we have found nothing that would arguably support an appeal.  *See id.* at 827–28 ("Due to the nature of *Anders* briefs, by indicating in the opinion that it considered the issues raised in the briefs and reviewed the record for reversible error but found none, the court of appeals met the requirement of Texas Rule of Appellate Procedure 47.1."); *Stafford*, 813 S.W.2d at 509.  We affirm the judgment of the trial court in the aggravated assault cause.

## III.    MOTION TO WITHDRAW

In accordance with *Anders*, Sadat's attorney has asked this Court for permission to withdraw as counsel.  *See Anders*, 386 U.S. at 744; *see also In re Schulman*, 252 S.W.3d at 408 n.17 (citing *Jeffery v. State*, 903 S.W.2d 776, 779–80 (Tex. App.—Dallas 1995, no pet.) ("[I]f an attorney believes the appeal is frivolous, he must withdraw from representing the appellant. To withdraw from representation, the appointed attorney must file a motion to withdraw accompanied by a brief showing the appellate court that the appeal is frivolous.") (citations omitted)).  We grant counsel's motion to withdraw.  Within five days of the date of this Court's opinion, counsel is ordered to send a copy of this opinion and this Court's judgment to Sadat and to advise him of his right to file a petition

---

court those issues which the indigent appellant believes the court should consider in deciding whether the case presents any meritorious issues."  *In re Schulman*, 252 S.W.3d 403, 409 n.23 (Tex. Crim. App. 2008) (quoting *Wilson v. State*, 955 S.W.2d 693, 696–97 (Tex. App.—Waco 1997, no pet.)).

for discretionary review.[5]  *See* TEX. R. APP. P. 48.4; *see also In re Schulman*, 252 S.W.3d at 412 n.35; *Ex parte Owens*, 206 S.W.3d 670, 673 (Tex. Crim. App. 2006).

## IV.  SUMMARY

We affirm the judgments in appellate cause numbers 13-17-00561-CR and 13-17-00562-CR.

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed this
25th day of October, 2018.

---

[5] No substitute counsel will be appointed.  Should Sadat wish to seek further review of this case by the Texas Court of Criminal Appeals, he must either retain an attorney to file a petition for discretionary review or file a pro se petition for discretionary review.  Any petition for discretionary review must be filed within thirty days from the date of either this opinion or the last timely motion for rehearing or timely motion for en banc reconsideration that was overruled by this Court.  *See* TEX. R. APP. P. 68.2.  A petition for discretionary review must be filed with the clerk of the Court of Criminal Appeals.  *See id.* R. 68.3.  Any petition for discretionary review should comply with the requirements of Texas Rule of Appellate Procedure 68.4.  *See id.* R. 68.4.